IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

MARTHA NEELY, individually
and as Administratrix for the
Estate of Brett Howie                                          PLAINTIFF


v.                          Case No. 5:10-cv-40-DPM


JEFFERSON COUNTY, ARKANSAS;
GERALD ROBINSON, in his official
capacity as Sheriff of Jefferson
County, Arkansas; and RANDY DOLPHIN,
in his individual and official capacities          DEFENDANTS

## ORDER

Brett Howie drowned while fleeing from Randy Dolphin, a Jefferson

County Sheriff's deputy.   Dolphin fired his service X-26 taser during the

chase.   Martha Neely, Howie's mother, sued Dolphin for using excessive

force, Jefferson County for failing to train Dolphin, and both for wrongful

death.   She also sued Sheriff Robinson.   Faced with Defendants' motion for

summary judgment, Neely seeks a trial.

**1.** One preliminary point.   Neely's official-capacity § 1983 claims

against Dolphin and Sheriff Robinson are actually claims against Jefferson

County. *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985). Those duplicative claims are therefore dismissed. *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998).

**2.** The Court views the record in the light most favorable to Neely, drawing all reasonable inferences in her favor. *Chambers v. Pennycook*, 641 F.3d 898, 904 (8th Cir. 2011). On a cold February afternoon, Dolphin responded to a domestic-disturbance call at the rural Neely residence. Dolphin first encountered Paul Weeks, a fourteen-year-old boy. He told Dolphin that Howie, the source of the disturbance, was behind the house. Dolphin knew Howie and knew he was wanted on felony warrants.

Dolphin approached Howie, telling him to "come to me." *Document No. 21-1, at 18*. Howie shook his head, took a final draw from his cigarette, and ran. Dolphin pursued, ordering Howie to stop. Dolphin drew his taser. The men continued running along a fence. Howie then jumped the fence, and headed towards a large pond. "The whole time I am asking [Howie] to stop, stop, stop. . . . [Howie], if you don't stop, I am going to [t]ase you." *Document No. 21-1, at 20*. At this point Neely and Weeks were behind the house, watching the chase.

-2-

Dolphin says he then fired his sole taser cartridge but missed Howie. Neely and Weeks saw it differently, and the Court credits their version in deciding the motion. "[Dolphin] tas[e]d [Howie] at that time. [Howie] was standing behind the tree. . . . you know, angling out." *Document No. 20-1, at 5.* Then Neely heard a popping noise, followed by Howie crying out and falling in the pond. "I did not know it hit him, but I know he hollered oh, and all of it transpired at the same time." *Document No. 20-1, at 6.* The next day, Weeks told a similar story to the Arkansas State Police. "[Dolphin] shot [Howie] with a [t]aser and he was shocking him and h[i]s legs quit working. [Howie] then fell into the pond and [Dolphin] let off the [t]aser[.]" *Document No. 20-1, at 40.*

When Dolphin fired his X-26 taser, it released two small darts on twenty-foot wires. On contact, the darts cause immobilization and pain. The State Crime Lab found no marks consistent with taser darts on Howie's body. But Neely points to various bruises and marks that could indicate tasing.

Taser electricity, moreover, can penetrate clothing. Dolphin acknowledged this on deposition: "If the barbs are stuck into [Howie's] clothing with the right spread—the right spread on them you can still get

-3-

immobilized through an arc through the clothing." *Document No. 21-1, at 15.*
The two taser darts were found a short distance into the pond with the lead
wires on the bank.  On this record, a reasonable fact finder could conclude
that Dolphin tased Howie next to the pond.

Howie was in the water for several minutes.  Neely estimated it was not
more than five or six minutes.  Everyone agrees that Howie was moving
around in the water trying to elude Dolphin, who was circling the pond
trying to meet Howie when he got back to shore.  According to Dolphin,
Howie eventually tired and drowned. Neely says Howie died from the taser's
lingering effects.  "[H]e acted like he was going to swim.  And I knew it
wasn't nothing for him to swim across that lake. . . . I told him, I said [Howie]
come back.  We're not going to do this.  Get back over here." *Document No.
20-1, at 7.*  She said Howie was ten or twelve feet from the bank at this point.
According to Neely, when Howie saw her, he turned around and started
swimming back toward her.  Then he said he couldn't move his legs and went
under.

Though Neely does not argue this point, the record can be read to
suggest a second tasing while Howie was in the pond.  This seems like a

-4-

physical impossibility.  Dolphin's taser logged two "firings":  one for five

seconds and another for three seconds about two minutes later.  *Document No.*

*20-1, at 41*.  But Dolphin had only one cartridge—the pronged wires that

uncoil and allow the officer to tase a person some feet away.  Dolphin sparked

his taser after Howie fell in, warning Howie he would "drive stun" him if he

did not surrender when he got out of the pond.  *Document No. 17-2, at 8*.  This

spark was both visible and audible.  A drive stun is where the officer presses

the taser itself against a person and shocks him.  No cartridge is needed.

Sparking is logged as a firing.  On deposition and in statements,  Neely and

Weeks said that Dolphin tased Howie again in the water.  *Document No. 20-1,*

*at 9–10, 40*.

Neely, however, has abandoned any second-tasing theory.  Her tactical

decision is understandable:  with Howie in the water out of Dolphin's reach,

and without a second cartridge available, a second tasing could not have

happened.  *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).  Early on, Neely and

Weeks must have mistakenly equated the sparking with a second tasing.

**3.**  Neely's Fourth-Amendment claim for excessive force fails.  Force is

excessive if its application was unreasonable.  *McKenney v. Harrison*, 635 F.3d

354, 359 (8th Cir. 2011). To answer reasonableness — a question of law — the Court must balance the nature and quality of the intrusion into Howie's Fourth Amendment interests against the government's interest in apprehending a fleeing suspect. The severity of Howie's crimes, any threat to Dolphin's safety, whether Howie was resisting arrest, and the result of the tasing inform this balance. *Ibid.*

A reasonable officer in Dolphin's place would have tased Howie beside the pond. This case is strikingly similar to *McKenney*. There an officer tased a fleeing suspect who was moving towards a second-story window. 635 F.3d at 357. The officer used one taser shock in a split-second judgment. Immobilized by the taser shock, McKenney went through the window and fell to his death. "Despite the fatal consequences of [that] incident, the level of force employed . . . was not unreasonable." 635 F.3d at 360.

Dolphin's taser shot near a deep pond was not excessive force in the circumstances. Howie was wanted on felony warrants and was fleeing arrest. This justified the taser's intermediate level of force. *Compare Tennessee v. Garner*, 471 U.S. 1, 9–11 (1985), *with McKenney*, 635 F.3d at 360. "The calculus of reasonableness must embody allowance for the fact that police officers are

-6-

often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary[.]" *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).  Dolphin used his taser in a relatively safe manner and area.  Importantly, it is undisputed that Howie moved around in the pond for several minutes still trying to avoid Dolphin after this five-second shock.  Unlike in the *McKenney* case, the fleeing suspect was not immobilized.

  **4.**  Dolphin is entitled to qualified immunity in any event.  He was trained not to tase suspects in a body of water without a second officer or rescue team being present.  Jefferson County's written taser policy also prohibited using the taser if a suspect might fall into a deep body of water after being immobilized.  Despite his training, Dolphin did not remember this part of the policy.  Dolphin's actions thus violated the letter of the policy.  This fact weighs against the reasonableness of Dolphin's actions.  But no clearly established law echoes the County policy.  Instead, "case law related to the [t]aser is [in the] developing stage[.]"  *McKenney*, 635 F.3d at 361–62 (Murphy, J., concurring).  Therefore, even if Dolphin violated the Fourth Amendment by tasing Howie near deep water, his violation of law was not

well-established in February 2007. *Williams v. Jackson*, 600 F.3d 1007, 1013–14 (8th Cir. 2010).

**5.** Neely's failure-to-train claim against Jefferson County fails because there was no underlying constitutional violation. The County cannot be liable for Dolphin's training when Dolphin followed the Constitution. *Neal v. St. Louis County Board of Police Comm'rs*, 217 F.3d 955, 959 (8th Cir. 2000). And this record establishes that Jefferson County adequately trained Dolphin. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). The Sheriff trained him on the County's taser policy; and Dolphin's misinterpretation of that policy on one occasion is not enough to hold the County responsible. *Board of County Comm'rs of Bryan County, Oklahoma v. Brown*, 520 U. S. 397, 409–10 (1997).

**6.** The Court declines to exercise supplemental jurisdiction over the state-law wrongful death claims. 28 U.S.C.A. § 1367(c)(3) (West 2006); *Glorvigen v. Cirrus Design Corp.*, 581 F.3d 737, 749 (8th Cir. 2009).

\* \* \*

Motion for summary judgment, *Document No. 16*, granted in part and denied in part. Neely's federal claims are dismissed with prejudice. Her state-law claims are dismissed without prejudice.

-8-

So Ordered.

_____

D.P. Marshall Jr.
United States District Judge

*12 August 2011*